The Full Circle case, Mr. Kroll, Mr. Kroll. May it please the Court. My name is Jeffrey Kroll, and I represent the appellant, the Automobile Mechanics Local 701 Pension Fund. I have reserved two minutes for rebuttal. This Court should reverse the District Court's opinion for two reasons. First, the District Court's opinion should be reversed as a matter of law based on this Court's recent decision into Seraph B. Manweb. At the very least, this matter must be remanded back to the District Court for further consideration under the modified notice rule set forth in Manweb. Second, the District Court's opinion should be reversed because alter ego liability does not require the showing of anti-union animus. Now, turning to the first issue, as this Court's jurisprudence has shown, there are two factors that a trial court must review in order to determine whether or not to impose successor liability. Those are notice and continuity of operations. Here, it's clear that the District Court held that there were too many questions of fact with regard to the continuity of operations factor. Therefore, the Court solely determined that notice could not be satisfied, thereby precluding the pension fund from prevailing on its successor liability claims. As this Court's jurisprudence has also shown, successor liability is an equitable doctrine. And that equitable doctrine requires this court, excuse me, the reviewing court, to determine and balance federal labor policy with free market principles. Now, here in the courts and in Congress, there is overwhelming support to further retirement benefits for retirees. And that's what this, the courts here have developed the successor liability theory of liability to deal with. It's not a rigid test, and it's basically, it's a flexible test, which allows the courts to review all the totality of the circumstances and facts before it. While in this Court's recent decision of Tessera v. Manweb, that notice rule forever changed. The landscape changed forever. Before, in the District Court here and in the District Court's case in Manweb and in RKN Concrete, they had a rigid rule that required that you actually have notice of the withdrawal liability prior to the sale in order to satisfy that notice standard. However, in Manweb, the Court held that the purchaser need not know, quote, unquote, the precise extent of the liability. That seems very strange. You say precise extent. Does it have to know anything? Yes, it does. Absolutely, it has to know something. Why? Here, similar to the facts in Manweb, there's an asset purchase agreement, right? That asset purchase agreement refers specifically to employee benefits liabilities. Now, what are employee benefits liabilities? Those are obligations to contribute to a pension fund, a welfare fund, and withdrawal liability. You don't get my question. You say the successor doesn't have to know the precise liability. Does it have to know anything except that there is some withdrawal liability? Does it have to have an approximate notion of how much it is? No, it should not have to know. Well, how do you buy a company without knowing what your liabilities are? Well, you can't sit in a situation where you allow the purchaser to do nothing. You can't allow them to not take any sort of investigatory steps following that specific knowledge of the fact that there is an obligation to contribute to the pension fund. So what are the investigatory steps that it should take? Well, as this Court has recognized in Mushikiwamba, Fusatec, and Wheeler v. Snyder, there is some sort of investigatory obligation that must be taken. Now, here the MPPAA, which is the very statute which provides for withdrawal liability, allows the contributing employer to go to the pension fund and request an estimate of that withdrawal liability. Here, that didn't happen. Rather than taking those steps and determining what the liability was, they turned a blind eye to it. So are you saying the purchaser can actually find out from the pension fund what the withdrawal liability is? The purchaser doesn't have a right. The original signatory entity does, though. I don't understand. If I'm purchasing a company, I want to know what withdrawal liability I'm going to have. Are you saying I can't find out what it is? No. You can ask the seller to request it from the pension fund. What is my liability? That's what the statute provides for. It authorizes a selling employer or a contributing employer to take that step. I'm talking about the purchaser. Correct. It could ask the seller, right? Right. Asking the seller is not enough. Does he have a right to that information, or can he ask the seller and the seller says, I don't want to tell you. I'm not interested in you. Go figure it out for yourself. He could certainly request it from the pension fund. Does the pension fund have any duty to supply the information? The MPPAA does not provide unless it is a contributing employer itself, the purchaser. But I don't understand how you can buy a company without knowing what its liabilities are. Well, here, this wasn't a free market transaction at all whatsoever, though, where that would have to come into play. This was a father selling his legacy to his son so he can continue that. So as far as thinking about whether or not there has to be an exact liability, those facts are not. I'm not talking about exact. You don't seem to think that the buyer has any right to the information. The statutory authority does not provide a specific right to the buyer, no. But the buyer can seek it. I don't see how the buyer can. for a liability that it can't estimate. That I don't believe is correct. It certainly can ask the seller, excuse me, the seller. You see, look, asking is not the same as being entitled to the information. So if you ask and the seller says, go to hell, you say the buyer now has no recourse. He cannot find out what withdrawal liability he will be stuck with. The alternative is he calls off the deal. That is absolutely right. Or he could do as the parties did in Man Web and as the parties did here. He could have an indemnification clause in that specific asset purchase agreement which refers to all liabilities that accrued prior to the sale in question. And here the parties used the broadest term that they could ever think of when referring to potential withdrawal liability, benefits liabilities. Well, as I stated, what else are those other than that? Is this a father-and-son deal as I understand it? Absolutely, a father-and-son deal. How about dead with my liability? He could have asked. But we believe it's a preconceived plan by these folks to avoid ever paying the withdrawal liability here because the record will show that specifically, rather than informing the pension fund that this was an asset transfer, right, it said that in a letter dated May 30th to the union that Hanna Maritime is changing its name to Full Circle. It never told the pension fund, never put the pension fund on notice that there was even going to be a sale. Therefore, based on this court's investigatory obligations that are imposed, it shouldn't allow this party to just turn a blind eye. It should have to take that additional step, ask the seller to provide that information. The additional step is what? To ask the seller to get the information from the pension fund as to what that exact liability or estimated liability is. And if the seller says no? Then, as I indicated, they can seek an indemnification agreement or they can call off the deal. They have to be aware of what their liabilities are. Now turning to the second issue, the district court erred in holding that the pension fund could not establish alter ego liability. As this court knows, there are three factors that a reviewing court should look at to determine whether or not alter ego liability should be imposed. The factor that is in question here is the second factor, which is normally deemed the fraudulent intent factor. Now this court in central transports determined that you did not have to have an exact showing of fraudulent intent in order to satisfy that second factor. Instead, you could show that a sham transaction occurred. Now that is clearly what happened here. But what's more, and let me go back specifically to the district court's opinion, the court referred to that, that that was a possibility, but in that same exact paragraph still required that there be some showing of fraudulent intent. So it erred as a matter of law. I see that I'm running short on time. I'd like to reserve the remainder of my time for my rebuttal. Thank you. That's fine, Mr. Crowell. Mr. Moore? May it please the court. The district court's judgment should be affirmed, and the case should not be remanded for reconsideration in light of Man Web because the record developed by the fund fails to establish that Mark, previously referred to as the son, had notice of HMC's possible withdrawal liability. First, it's undisputed the only evidence presented by the fund was that prior to the closing of the asset purchase agreement, Mark was aware that HMC had an obligation to contribute to the pension fund. There's no evidence as to what Mark knew before he signed the asset purchase agreement. There's no evidence that Mark knew that the fund was underfunded or that HMC faced withdrawal liability prior to the asset purchase agreement. There's no evidence that Mark knew of the concept of withdrawal liability before the asset purchase agreement. There's no evidence that Mark had responsibility at HMC with respect to pension funds or the union or the prior experience with union pension funds. There's not even evidence in the record that the seller, HMC, had notice of its own potential withdrawal liability, and there's certainly no evidence whatsoever that this was some kind of preconceived plan to defraud the union or its pension fund, particularly when one month prior to the close of the sale, Mark reached out to the union, said that Full Circle Group was coming in, that he wanted to negotiate a contract between Full Circle Group and the union, and then shortly after the close of the sale, the union sent letters to Mark, which included a participation agreement, which completely belies the idea that Mark was trying to hide anything. He then made voluntary contributions to the union and stopped when the employees voted to decertify the union. Because there's no evidence that Mark had any knowledge of HMC's potential withdrawal liability. How much knowledge would he have to have, in your view? In reading the Man Web case, if we look at the facts of that case, that shows what knowledge is required. What is it? You would have to know that the fund is underfunded. That's what the buyer would have to know. How would he find that out? During the course of due diligence? No, during the course of what? Due diligence. You mean he has to ask his daddy, or does he have to ask the union? What I've seen in all of the court's jurisprudence is that you have to have— Who does he ask, the seller or the union? Based on my understanding, he would need to go to the seller, because the seller is the only one that has the right to get the information from the fund. So if the seller doesn't voluntarily furnish the information, he would respond, if he wanted to sell it, to the request to get the information from the union. He would be able to follow up with the union. But the average person doesn't know anything about withdrawal liability. And if we look at the court— The average person is not the son of the man who owns the company that's being sold, either. But there's no evidence that either one even understood withdrawal liability or that the fund was underfunded. The father didn't know that he had withdrawal liability? There's no evidence in the record that says that. Is there an agreement between his company and the union? There is. I don't believe that that was made part of the record. And there's nothing—the record is silent on that subject? The record that was presented to Judge Kocouris is silent on that. Additionally, if we look at this court's jurisprudence with respect to due diligence, the court has said there is no blanket due diligence requirement in the absence of notice of a specific claim. The union suggests that Mark failed to do due diligence. That is not true. The record establishes, and their own brief says, that Mark hired an attorney to help him evaluate the assets and to structure the deal. And the union's brief specifically says that that attorney was competent to do so. And the attorney didn't know anything about withholding liability? Apparently not. It's not in the record, and the attorney was deceased before his deposition could be taken. But there's no evidence in the record of that. There's just no evidence in the record that the seller knew of withdrawal liability or that Mark knew about withdrawal liability. If we look at ManWeb. That's like saying if you don't know you owe income tax, you don't have to pay it. There are lots of liabilities which do not depend on the awareness of the liable person. I don't think that the law expects the asset buyer to assume and know about all the liabilities. But when you look at ManWeb, the whole point of ManWeb was the concern with pension funds being left holding the bag where things were not paid. So what's your best argument as to why contingent liability under ManWeb doesn't encompass the mere possibility of withholding liability sometime in the future? Why wouldn't that cover it? Withdrawal liability, one, is not automatic. The fund has to be unfunded. Two, there are other exemptions. There are de minimis reductions. There's a six-year window where someone who's participating in a plan could pull out. There are numerous exemptions where it's not applied. But on the facts in ManWeb, it was undisputed. The seller and the buyer knew about withdrawal liability. They talked about it beforehand. One of the owners of the company said he knew all about withdrawal liability. He knew that this fund was underfunded, and he was specifically concerned and wasn't sure if he wanted to do this deal because of the potential for withdrawal liability. We have no facts like that here in this case. There's no facts that would have put. So who's left holding the bag? It's a great question. And in all these cases, we have to balance the equities to the common law rule. So then the union members have to pay the price if the seller is ignorant and the buyer is ignorant, right? I mean, that's essentially what you're saying. That's who's left holding the bag. You said you didn't know who was left. The union's left holding the bag. The fund is left holding the bag. The fund also has a fiduciary obligation to make sure that its participating employers are aware of when the fund is underfunded and of their own withdrawal liability. So are you saying now that the, I can't remember, Mark, that Mark didn't know that it was underfunded? There is no evidence that he knew it was underfunded. He didn't know anything about withdrawal liability. We presented affirmative testimony that he did not know about this. How that can be a defense leaves me baffled. You have a liability. You're too dumb to discover it. As I say, like the paying taxes. I don't know how to pay taxes. How can you make me pay taxes when I didn't know I had to pay taxes? The general, as we get from the Moore Science Temple people, right? They say, I'm going to pay taxes. Payment of taxes by Moores to the United States Treasury is voluntary. And there I think many of them are in perfectly good faith. They just didn't know that payment of income tax is involuntary, not voluntary. This seems like the same thing. You buy a company. You investigate the liabilities it may have. And if you don't investigate, you don't investigate carefully, you may find yourself with liabilities you didn't realize you have. The common law rule has always been that the asset purchaser does not assume the liabilities. Successor liability is the exception. It is not the rule. The ERISA statute does not specifically provide for successor liability. Instead, if we look at the MIPA amendments, if we look at Section 1390, there Congress said the seller remains liable for the withdrawal liability unless the asset buyer expressly takes on certain obligations as part of the deal, including posting a bond and contributing to the plan. So this suggests that Congress has already decided that the common law rule is still in place, that it's the seller, not the buyer, that will be liable. And if Congress wants to change the rules under ERISA or wants to change the common law rule, it will so act. Notice has been the bedrock principle underlying the court's adoption of the successor liability. In each of these cases, the court has said that the buyer needs to have noticed that this was forthcoming. Here there is no evidence that he had noticed that this was forthcoming, and so there was no way for him to say, you know what, I want out of this deal. Whose duty is it to provide the notice? It's a tough question. In this court's decision in Wheeler, the court said that the seller was in the best position to provide that information. Then the buyer could have followed up, but then the court reached this court. So does the seller have a duty? The seller has a duty when it has notice of an actual liability or claim, and here there's no evidence of that. I don't understand. When a seller is selling a company and the seller has withdrawal liability, doesn't it have to notify the buyer? No, I'm not aware of any provision. What sense does that make? I can't say that it does make sense, but here the claim is against the buyer and not against the seller. I see that my time has come up, but I would like to make a quick point on the alter ego analysis. This court has always said that fraudulent intent is the critical element. Additionally, when the district court was responding to the party's arguments, it considered in the alternative whether there was evidence that this was a sham transaction, and the district court specifically found that the fund had failed to establish that this was a sham transaction. For all these reasons, we would respectfully request that this court affirm the district court's judgment in its entirety. Yes, Mr. Crowell, do you have anything further? I have a couple points I'd like to make on rebuttal here. First off, Your Honors, the question of who should be required to get this information, the practical matter is, the practical reality is that the two parties to a sale are private parties that are not going to go and advertise to everyone in the world that a sale is occurring. That's practical reality, and practical reality, me dealing with this on a regular basis, is that the pension fund and the union do not become aware of a sale until following that sale. Therefore, they cannot be required to have the burden of informing the parties that withdrawal liability is owed. Now, just referring to the sham transfer portion that counsel just alluded to, now, yes, the district court did consider, based on central transports, that a sham transfer could satisfy that second factor. Unfortunately, in that very same paragraph, the court then required that there be a showing of fraudulent intent to avoid union or pension liabilities. It erred, and this court should recognize that. Now, finally, oh, I see that my time has expired. No, go ahead. You can finish. Finally, as Your Honors are aware, this is an equitable doctrine. If this court were to allow the district court's case to stand, it would be tipping that balance too far in favor of the employers. We request that you tip it at least so it's equal so the employees can have an equal chance. Thank you. Okay, thank you very much to both counsel. Next case for argument, United States v. Walton. Mr. Greenlee.